FILED
05/12/2020
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs at Knoxville October 29, 2019

## STATE OF TENNESSEE v. ANTWON YOUNG

**Appeal from the Criminal Court for Shelby County**
**No. 15-04917     Paula L. Skahan, Judge**

_____

### No. W2019-00090-CCA-R3-CD

_____

The Defendant, Antwon Young, was convicted after a jury trial of two counts of first degree felony murder; two counts of attempted second degree murder, a Class B felony; two counts of employing a firearm during the commission of a dangerous felony, a Class C felony; one count of attempted especially aggravated robbery, a Class B felony; eight counts of attempted aggravated robbery, a Class C felony; and one count of aggravated assault, a Class C felony. See Tenn. Code Ann. §§ 39-12-101, -13-102, -13-202, -13-210, -13-402, -13-403, -17-1324(b), -17-1324(i)(1). The trial court imposed a total effective sentence of life, to be served partially consecutively to the Defendant's sentence in Shelby County case numbers 15-05135 and 15-109300.[1] In this appeal as of right, the Defendant contends that (1) the evidence was insufficient to sustain his convictions; (2) the trial court erred by denying his motion for a mistrial after a reference was made to the Defendant's being previously incarcerated; (3) the trial court erred by not allowing evidence of a witness's gang affiliation; and (4) the trial court erred by sustaining the State's objection during counsel's closing argument. Following our review, we affirm the judgments of the trial court, but remand for the correction of clerical errors in the judgments in Counts 1, 2, 5 and 15.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed;**
**Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and J. ROSS DYER, J., joined.

_____

[1] In Shelby County case number 15-05135, the Defendant, Marterius O'Neal, and Melvin Wiggins were convicted of the October 11, 2014 especially aggravated kidnapping and aggravated robbery of a pizza delivery driver. See State v. Antwon Young, No. W2019-00492-CCA-R3-CD, 2020 WL 1491377, at *1 (Tenn. Crim. App. Mar. 26, 2020). The circumstances of case number 15-109300 are not clear from the record.

Iclem S. Jaber (at trial and on appeal) and Mitchell Wood (at trial), Memphis, Tennessee, for the appellant, Antwon Young.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Pam Stark and Leslie Byrd, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL BACKGROUND**

This case arises from the October 4, 2014 attempted armed robbery of a group of thirteen young men, as a result of which Juan Pedro Casillas Garcia and Alvaro Casillas Becerra were killed, and Jose Guadalupe Almanza Rodriguez and Juan Jesus Garcia Gaitan were shot. On October 1, 2015, the Shelby County grand jury indicted the Defendant and co-defendant Marterius O'Neal on the following counts:

| Count | Offense | Victim[2] |
|---|---|---|
| 1 | First degree felony murder | Juan Pedro Casillas Garcia |
| 2 | First degree felony murder | Alvaro Casillas Becerra |
| 3 | Attempted second degree murder | Jose Guadalupe Almanza Rodriguez |
| 4 | Attempted second degree murder | Juan Jesus Garcia Gaitan |
| 5 | Employing a firearm during the attempt to commit a dangerous felony | Jose Guadalupe Almanza Rodriguez |
| 6 | Employing a firearm during the attempt to commit a dangerous felony | Juan Jesus Garcia Gaitan[3] |
| 7 | Attempted especially aggravated robbery | Jose Guadalupe Almanza Rodriguez |

---

[2] Many of the victims in this case were related and share first or second surnames and, in some cases, first names as well. Several of the victims' full names were given in testimony but were not reflected as such on the indictments. Where possible, we have listed the victims' full names the first time they are used, and for clarity, we will refer to them thereafter using their first names. If two victims share the same first name, we will refer to them by their first two names. We intend no disrespect.

[3] It was established in testimony that Juan Jose Garcia Gaitan, Juan Jesus's twin brother, was also present at the crime scene. Juan Jose is, however, not included as a victim in the indictments. There was also one reference to a "Juan Jose Rodriguez Garcia"; it is unclear to whom the witness referred by this name.

| 8 | Attempted aggravated robbery | Juan Jesus Garcia Gaitan |
|---|---|---|
| 9 | Attempted aggravated robbery | Manuel de Jesus Casillas Rodriguez |
| 10 | Attempted aggravated robbery | Javier Nava |
| 11 | Attempted aggravated robbery | Reynaldo Soriano Almanza |
| 12 | Attempted aggravated robbery | Leonardo Rodriguez Garcia |
| 13 | Attempted aggravated robbery | Martin Almanza Rodriguez |
| 14 | Attempted aggravated robbery | Luis Miguel Garcia Gaitan |
| 15 | Attempted aggravated robbery | Aurelio Rodriguez |
| 16 | Aggravated assault | Eduardo Soriano Almanza |

A second co-defendant, Austin Yewell, was indicted on twenty-two separate counts in connection with this case. [4,5]

The evidence at trial established that on Friday, October 4, 2014, Juan Pedro and Alvaro had arrived in Memphis by bus from Texas. Juan Pedro's uncle dropped them off at a house on Gherald Street in the Nutbush neighborhood, where they planned to stay; several young men from the same hometown in Mexico lived in the house. A group of thirteen or fourteen young men gathered throughout the afternoon and evening to welcome Juan Pedro and Alvaro and spend time together. The group consisted of Juan Pedro, Alvaro, Manuel, Jose, Juan Jesus, Javier, Reynaldo, Leonardo, Martin, Luis, Aurelio, Eduardo, and Juan Jose. It was noted that two cars were parked in the driveway, two were parked on the street in front of the house, and a truck was parked in the front yard. Gherald Street was described as having a "horseshoe" shape, and the house was located beside a curve in the road.

---

[4] Co-defendant Yewell testified that he lent his .38-caliber revolver to his best friend, Randy Champion, knowing that Mr. Champion would commit robberies with it. After committing several offenses using the gun, Mr. Champion eventually left the state and gave the gun to co-defendant O'Neal. Co-defendant Yewell was eventually arrested and indicted for "probably fifty various crimes" in multiple cases. He was charged with facilitation of first degree murder in the Defendant's case in exchange for his testimony.

[5] Co-defendants O'Neal and Yewell were tried separately from the Defendant.

Meanwhile that afternoon, the Defendant and his cousin, co-defendant O'Neal, were at their grandmother's house. Melvin Wiggins[6] was also there visiting with his girlfriend, who was the Defendant's sister, and their child. Co-defendant O'Neal asked Mr. Wiggins to buy him a magazine for a .45-caliber handgun. Mr. Wiggins went to a gun store with co-defendant O'Neal, purchased a magazine, and gave it to him.

At some point before sunset, co-defendant Yewell also arrived at the Defendant's grandmother's house; co-defendant Yewell was a friend of co-defendant O'Neal and knew the Defendant "relatively well." Co-defendant Yewell noted that co-defendant O'Neal, the Defendant, Mr. Wiggins, a "tattoo artist," and other family members were present at the house.

After co-defendant O'Neal and Mr. Wiggins returned from the gun store, co-defendant O'Neal, the Defendant, and co-defendant Yewell "went to the bottoms" to "see if the gun worked." When they returned, co-defendant O'Neal told Mr. Wiggins that the gun shot well and that "they were going to hit a lick on some Mexicans." Co-defendant Yewell testified that "hit a lick" referred to committing a robbery. The Defendant and co-defendant O'Neal discussed the plan further while co-defendant O'Neal was getting a tattoo. They asked co-defendant Yewell if he would "take them to look for a spot," and he agreed.

Mr. Wiggins estimated that co-defendant Yewell, the Defendant, and co-defendant O'Neal left at 4:00 or 5:00 p.m.; he also stated that the conversation about robbing Mexican people occurred as the sun was setting. Co-defendant Yewell stated, however, that the conversation about "hitting a lick" occurred around 8:00 p.m. and that they left afterward in co-defendant Yewell's grandmother's van.

Mr. Wiggins initially testified that co-defendant O'Neal was armed with only a .45-caliber handgun. Upon reviewing his police statement, however, Mr. Wiggins recalled that he saw co-defendant O'Neal with both a .45-caliber handgun and a .38-caliber revolver. Co-defendant Yewell testified that he saw the Defendant with a .38-caliber revolver belonging to co-defendant Yewell and that co-defendant O'Neal had a .45-caliber handgun. Co-defendant Yewell was familiar with the .45-caliber handgun from a previous occasion when they tested the gun and the gun's magazine malfunctioned.

---

[6] Mr. Wiggins testified that he was in custody after being convicted of especially aggravated kidnapping and aggravated robbery in Shelby County case number 15-05135. He initially stated that in exchange for his testimony in the Defendant's case, he hoped to receive "some assistance" with sentencing in his case; he noted, though, that he had not been guaranteed any consideration. However, he later denied hoping to receive a better sentence in exchange for his testimony. Mr. Wiggins acknowledged facing a fifteen-year minimum and twenty-five-year maximum sentence in his case.

Co-defendant Yewell noted that he drove down a street that was "made like a horseshoe." Co-defendant O'Neal identified "some people outside and . . . [said,] there they go," meaning that "they were going to rob [those] people." Co-defendant Yewell described the group as six or seven Hispanic men who were "outside getting drunk" and "having a good time."

Co-defendant Yewell "made one more circle" around the horseshoe in order to ensure no one else was "out" and eventually parked one street over from the targeted group of men. Co-defendant O'Neal and the Defendant left the van and walked around the corner, and co-defendant Yewell waited for them to return.

Manuel, Javier, Leonardo, and Jose testified regarding the events that followed.[7] Around 10:00 p.m., two African-American men approached the group from the street, and one of them shot a gun into the air twice. None of the witnesses could identify the men, although they were both described by one witness as being about age twenty-five and thin. One of the men was about five feet six inches tall and wore a gray sweatshirt and dark pants; the other man was taller and wore a red sweatshirt, dark pants, and a cap. Manuel and Javier stated that both men wore hoods. Some witnesses saw both men with guns, and some only saw one gun.

One of the men yelled, "Get down m-----f---ers." Some of the men, including, Javier, got onto the ground, but others remained standing. Javier, who was the only fluent English speaker of the group, translated the men's orders. Javier saw that Manuel had frozen in place and urged him in Spanish to get onto the ground. Manuel remained standing, and the shorter man walked up to Manuel and pointed a gun at Manuel's head before taking Manuel's wallet from his pocket. Multiple witnesses stated that they believed the African-American men meant to rob them.

At this point, four men inside the house—Eduardo, Alvaro, Juan Pedro, and Juan Jesus[8]—rushed to the front door and began to open it; both African-American men fired about ten shots in total at them. Bullets struck Alvaro, Juan Jesus, and Juan Pedro. Some of the people standing in the front yard began to run toward the back of the house, and one of the African-American men fired at them, striking Jose in the leg. Both shooters ran away; Manuel noted that the shorter man dropped Manuel's wallet after removing it

---

[7] It was noted that Juan Jesus, Reynaldo, Martin, Luis, Aurelio, and Eduardo had moved away from Tennessee by the time of trial.

[8] Juan Jesus was identified as Juan Jose by one witness, who noted that the two men were twins and easily confused for one another. In any event, the record reflects that Juan Jesus was taken to the hospital with a gunshot wound, and his name appeared in the indictment in Count 4, attempted second degree murder.

from his pocket. During the entire incident, the witnesses described the shooters as having walked toward the house from the street; firing the initial shots into the air from the roadway; standing on the sidewalk near the cars in the driveway; and standing near the truck parked in the yard.

Alvaro died on the scene; Juan Pedro died in the hospital; and Juan Jesus, who was shot in the knee, and Jose, who was shot in the right leg and left knee, recovered after undergoing surgery. Dr. Marco Ross performed the autopsies and concluded that Alvaro's cause of death was a gunshot wound to the upper chest, which perforated the "left common carotid artery" and the aorta, passed through the left lung and a rib, and came to rest in his back. The wound was highly lethal, even if medical intervention had been immediate. Juan Pedro's cause of death was a gunshot wound to the abdomen, which entered at the front of the abdomen, passed through the small intestine, the left iliac artery and vein, and the left side of the pelvis, and came to rest in his left buttock. The manner of death in both cases was homicide.

Co-defendant Yewell waited five minutes and heard multiple gunshots; after about five more minutes, the Defendant and co-defendant O'Neal ran around the corner and got back into the van. Co-defendant Yewell noted that the two men "had a[n] adrenaline rush" and that co-defendant O'Neal "stated that they almost got them, that they almost robbed them but people came outside, they started running." The Defendant stated that he thought that "he hit one of [those] b--ches in the chest." Co-defendant Yewell dropped both men off at their grandmother's house. Mr. Wiggins testified that the Defendant, co-defendant O'Neal, and co-defendant Yewell returned to the house after nightfall between 7:00 and 8:00 p.m. Mr. Wiggins noted that he left the Defendant's grandmother's house at 9:30 p.m. to put his child to bed. A few days later, co-defendant O'Neal returned co-defendant Yewell's gun to him, and he subsequently sold it to a neighbor. Co-defendant Yewell identified his .38-caliber revolver, which had been recovered by police, in court.

Memphis Police Officer Christopher Sanders and Lieutenant Joseph Johnson testified that they interviewed witnesses, photographed the scene, and collected evidence. Three shell casings were recovered from the end of the driveway; multiple bullet holes were documented in the front of the house and inside the house. Spent bullets were also recovered at the scene. The vehicles around the house were not tested for fingerprints or DNA; the investigating officers noted multiple times that no witness statements indicated that the vehicles had been touched by the shooters.

Tennessee Bureau of Investigation Special Agent Cervinia Braswell, an expert in firearms examination and ballistics, testified that she examined three shell casings, spent bullets, and the .38-caliber revolver. She identified the shell casings as .45-caliber and having been fired by the same gun. Some of the bullets were .45-caliber and had "similar

-6-

rifling characteristics," but she could not determine whether they were fired by the same gun. An additional bullet was .38-caliber and, when compared to a test bullet fired from the .38-caliber revolver, showed similar "individual characteristics"; however, the individual characteristics were insufficient for a conclusive determination that the recovered bullet was fired from the revolver. She noted that when bullets passed through objects or people, damage occurred such that individual characteristics might not be discernable. She confirmed that DNA and fingerprint evidence deposited on shell casings during loading would have been destroyed by the combustion process of firing the gun.

Memphis Police Sergeant Eric Kelly testified that in October 2014, he was part of a special task force "assembled to address numerous crimes" occurring in the Nutbush neighborhood of Memphis in which "suspects were targeting Hispanic victims [in] various robberies and homicides that had occurred." He discovered that co-defendant Yewell had loaned out a gun to his best friend, Randy Champion, that had been used "in the vast majority of the robberies and possibly in the homicides[.]" Sergeant Kelly noted that the Defendant was arrested in March 2015 and that as a result of the length of time that had passed since the offenses in this case, he did not seek a search warrant for the Defendant's home. Sergeant Kelly acknowledged that co-defendant Yewell indicated in one statement that the Defendant might have still had possession of the .45-caliber handgun.

Co-defendant Yewell gave multiple police statements after his March 2015 arrest. In his first statement, Sergeant Kelly asked if co-defendant Yewell knew who killed Alvaro, and co-defendant Yewell denied knowing who Alvaro was. In a second interview, Sergeant Kelly gave co-defendant Yewell additional details about the circumstances of Alvaro's murder, and co-defendant Yewell gave a statement consistent with his trial testimony regarding the events of October 4, 2014. He further identified the Defendant in a photographic lineup as the person who was with co-defendant O'Neal and himself.

Co-defendant Yewell acknowledged stating at a prior proceeding that on October 4, 2014, he did not know how the Defendant was related to co-defendant O'Neal or their shared grandmother. He did not recall telling the police that the Defendant arrived after co-defendant O'Neal finished getting a tattoo.

Co-defendant Yewell affirmed that in exchange for his truthful testimony, he would not be charged with first degree murder. Co-defendant Yewell stated his plea agreement consisted of being charged with facilitation of the various offenses committed using his gun rather than the offenses themselves. Relative to another case involving a first degree murder and especially aggravated robbery committed by Mr. Champion and co-defendant O'Neal, co-defendant Yewell explained that although he was charged with

-7-

facilitation in that case, "[it] was the one deal and [he] got indicted on facilitation charges. There was never a deal actually worked out with them." He stated that the only case in which he made a plea agreement was the Defendant's case. He said, "No, the deal was set for this case today. I was indicted, I was charged with two charges originally and then I had a secret indictment which came in and they [were] all facilitation charges. I was not aware of what I would be charged with at the time." He acknowledged testifying in Mr. Champion's trial that he may have avoided certain charges in exchange for his testimony and that there was a "possibility" his testimony could lead to his release from jail "in the future," although he had no guarantee of that outcome.

On cross-examination, co-defendant Yewell maintained, in response to repeated questioning about why he "like[d]" robbing people and "[d]id it a lot," that although he was legally responsible for the robbery of victims "[t]oo numerous to count," he himself did not rob anyone. He stated that he expected a share of the proceeds of the robberies "[if] they received any but not necessarily." He acknowledged that he was "in a way" responsible for the victims' deaths.

At the conclusion of the State's proof, the Defendant made a motion for judgment of acquittal, arguing that relative to the victims inside the house, "there was no attempted robbery perpetuated against these individuals. That the suspects didn't even appear to know that these individuals were on the scene." The Defendant also argued relative to Counts 1 and 2 that the robbery of Manuel occurred after the shooting stopped, meaning that "the intent to actually rob somebody didn't arise until after the shooting stopped and died down and that's when the . . . attempted robbery took place." He also argued that Counts 1 and 2 should result in a conviction for "second degree murder at best, possibly a voluntary manslaughter if there was a reckless homicide during that time." The Defendant argued relative to Counts 3 and 4 that "those . . . might be an aggravated assault" and that because the victims were shot in the leg, "the person that was pulling the trigger . . . certainly wasn't aiming at the body in trying to kill anyone. From the best [counsel] could tell . . . there was just kind of a random shooting into the crowd, not really with the intent to kill anyone."

The Defendant requested that Count 16, the aggravated assault of Eduardo, be dismissed because there was "no testimony that he saw or knew or was in fear or saw a weapon or anything, that he ever actually even made it outside" or was near the door. Regarding Counts 7-15, attempted aggravated robbery, the Defendant argued that "there was no attempted taking from anyone" other than Manuel and that only one attempted aggravated robbery should go to the jury. He requested that the remaining counts be reduced to aggravated assault. Relative to Counts 5 and 6, the Defendant argued that

-8-

they should be dismissed because the evidence was insufficient regarding the underlying dangerous felony, attempted second degree murder.

The State responded that the testimony regarding a plan to "rob some Mexicans, plural," the identification of the group of victims from co-defendant Yewell's grandmother's van, the fact that the Defendant and Mr. O'Neal pulled out guns, shot into the air, and told everyone to get down on the ground was sufficient for a circumstantial inference of an attempted robbery. The State noted that the deceased victims' knowledge of the robbery attempt was inconsequential to the Defendant's guilt on the felony murder counts. Relative to Eduardo, the State argued that the testimony established that gunshots could be heard inside the house, that bullet strikes were found inside the house, and that use of a deadly weapon and reasonable fear had been proven. Relative to attempted second degree murder, the State argued that the shooting "grew out of the circumstances when they were surprised by people coming out of the house." The State noted that it did not result in a "bonus or reduction in charges simply because they were a bad shot and they weren't able to shoot them in the head . . . and chest and them not die[.]" Relative to the attempted aggravated robberies, the State argued that a plan to commit a robbery had been formed and substantial steps had been taken toward its completion, such as purchasing a magazine, arming themselves, driving around in search of a target, and approaching the victims while shooting and telling everyone to get down. Relative to the attempted especially aggravated robbery, the State argued that Jose suffered gunshot wounds in both legs and required surgery. The court stated without further findings that the State had made a prima facie case in all sixteen counts and denied the motion.

The Defendant was thereafter convicted as charged. The trial court imposed statutory life sentences for the felony murder convictions, and after a sentencing hearing, imposed the following sentences for the remaining convictions: sixteen years for each attempted second degree murder; six years for each employing a firearm during the commission of a dangerous felony; sixteen years for the attempted especially aggravated robbery; eight years for each attempted aggravated robbery; and eight years for the aggravated assault. All of the sentences were ordered to be served concurrently to one another and consecutively to the Defendant's sentence in Count 1 of Shelby County case numbers 15-05135 and 15-109300. The Defendant timely appealed.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant contends that the trial court erred by denying his motion for a judgment of acquittal, arguing that the evidence was insufficient to sustain his convictions. He raises specifically that none of the victims identified the Defendant; that no physical evidence linked the Defendant to the crime scene; that Mr. Wiggins placed

the Defendant and co-defendant O'Neal at their grandmother's house at 9:30 p.m., which was before the robbery occurred; and that co-defendant Yewell provided only "hearsay testimony" with "indications of bias" due to his plea agreement with the State. The State responds that the evidence was sufficient.

A motion for judgment of acquittal raises a question of law, i.e., the legal sufficiency of the evidence, for determination by the trial court. State v. Adams, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995) (citing State v. Hall, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983)). Thus, on appeal, this court applies the same standard of review both to the trial court's denial of a motion for a judgment of acquittal and to the sufficiency of the convicting evidence underlying the jury's verdict. State v. Carroll, 36 S.W.3d 854, 869 (Tenn. Crim. App. 1999) (citing State v. Ball, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998)). Therefore, we must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the

[d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Relative to this case, felony first degree murder is defined as the "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" Tenn. Code Ann. § 39-13-202(a)(2). Tennessee Code Annotated section 39-13-401 defines robbery as the intentional or knowing theft of property from the person of another by violence or putting the person in fear. A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103.

As relevant to this case, robbery is elevated to aggravated robbery when it is "accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" Tenn. Code Ann. § 39-13-402. Especially aggravated robbery is robbery accomplished with a deadly weapon and where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403(a).

Criminal attempt, as charged here, occurs when a person "acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3). To qualify as a "substantial step," the person's "entire course of action" must be "corroborative of the intent to commit the offense." Tenn. Code Ann. § 39-12-101(b).

Relevant to this case, it is an offense to employ a firearm during the attempt to commit second degree murder. Tenn. Code Ann. § 39-17-1324(b)(2), (i)(1)(B).

"Second degree murder is . . . [a] knowing killing of another." Tenn. Code Ann. § 39-13-210. "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11- 302(b).

Intentionally or knowingly causing another person to reasonably fear imminent bodily injury is an assault. Tenn. Code Ann. § 39-13-101(a)(2). An assault is aggravated if it "involved the use or display of a deadly weapon." Tenn. Code Ann. § 39-13-102(a)(1)(A)(iii). A "deadly weapon" is defined as: "(A) A firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury; or (B) Anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tenn. Code Ann. § 39-11-106(a)(5).

The Defendant's alleged grounds of insufficiency relate to the credibility of the witnesses and the weight of the evidence presented, both of which are the province of the jury. The State's burden was to prove the elements of the offenses beyond a reasonable doubt; no element of the charged offenses required eyewitness identification by the victims or a DNA or fingerprint match from the crime scene. The jury was free to discredit all or part of any witness's testimony, including the time of night Mr. Wiggins estimated the Defendant returned. Likewise, the jury heard extensive cross-examination of co-defendant Yewell regarding his motivation to testify and various inconsistencies between his statements; nevertheless, the jury credited his testimony, as was its prerogative. The jury weighed the evidence and, by its verdict, accredited the State's witnesses and resolved any conflicts in testimony in favor of the State.

In the light most favorable to the State, the evidence established that co-defendant O'Neal and the Defendant made a plan to "hit a lick" on Hispanic people, obtained a working magazine for the malfunctioning .45-caliber handgun, armed themselves, and asked co-defendant Yewell to drive them around town to identify vulnerable targets. After choosing the Gherald Street house and parking around the corner, co-defendant O'Neal and the Defendant walked back to the house, fired two shots into the air, and ordered the victims onto the ground. One of the men took Manuel's wallet from his pocket and dropped it. When they were surprised by the victims inside the house opening the door, both co-defendant O'Neal and the Defendant opened fire on the people in the house and those in the yard who attempted to flee to safety, striking the house and four people present. Two victims required surgery to treat their wounds, and two victims died. The Defendant bragged during the getaway that he shot "one of those b--ches in the chest."

A reasonable juror could have found that the Defendant committed first degree felony murder, attempted second degree murder, attempted aggravated robbery, attempted especially aggravated robbery, and aggravated assault, and that he employed a firearm while committing attempted second degree murder. The evidence was sufficient, and the Defendant is not entitled to relief on this basis.

*II. Mistrial*

The Defendant contends that the trial court erred by denying his motion for a mistrial after co-defendant Yewell stated that the Defendant had been previously incarcerated. The State responds that the prosecutor did not elicit the statement and that the curative instruction issued by the court made a mistrial unnecessary.

During co-defendant Yewell's direct examination, the following exchange occurred after he noted that the Defendant was living with his grandmother on October 4, 2014:

Q: He spent a lot of time there?

A: Yes, ma'am.

Q: Was it unusual for you to go over to the grandma's house[?]

A: No, ma'am.

Q: How often did you go over there?

A: Not every day but enough to check on a grandma.

Q. Okay. And was it unusual for [co-defendant O'Neal] to be up there?

A. No, ma'am.

Q. And did you say [the Defendant] actually lived there at the time?

A. I think so.

Q. Okay. Did you ever go over there during that time period and not see [the Defendant] over there?

A. Yes.

Q. Okay. What percentage of the time that you went over there would [the Defendant] be there?

A. I didn't really . . . see [the Defendant] . . . that much because I think he was locked up, incarcerated for most of the time.

Thereafter, defense counsel requested a bench conference and moved for a mistrial. The following exchange occurred:

[THE STATE]: There is a curative instruction and I'll submit it to the Court.

THE COURT: All right.

-13-

[THE STATE]: I'm sorry, I had no idea that that would come out, none. It was completely --

THE COURT: All right. I will see what I can do. I'm going to talk to each one of them. Okay.

The trial court then addressed the jury:

THE COURT: Ladies and gentlemen, that was not responsive to the question. Whether or not [the Defendant] was incarcerated has nothing to do with this case. I have no idea what he was incarcerated for or whether he was incarcerated. But that is irrelevant to your consideration for these charges this week. Okay. So I need you to strike that from your minds, not consider it for any purpose. Is everybody able to do that?

The jurors as a group answered affirmatively; the court proceeded to poll and receive an affirmation from each juror. At the motion for a new trial hearing, the trial court found relative to the motion for a mistrial that co-defendant Yewell's comment "was unfortunate" and "wasn't expected." The court noted that it had "talked about [that the comment] had nothing to do with this case and instructed the jurors as appropriately as [it] could at that point. So it was not grounds for a mistrial. It was not sufficient to rise to that level."

The purpose of declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). For a mistrial to be declared, there must be a "manifest necessity" that requires such action. State v. Robinson, 146 S.W.3d 469, 494 (Tenn. 2004); State v. Millbrooks, 819 S.W.2d 441,443 (Tenn. Crim. App. 1991). A mistrial is only appropriate when the trial cannot continue without causing a miscarriage of justice. State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000); see State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The decision to grant a mistrial is within the sound discretion of the trial court. State v. McKinney, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. Land, 34 S.W.3d at 527. This court will not disturb the trial court's decision unless there is an abuse of discretion. State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990). In evaluating whether the trial court abused its discretion we may consider: "(1) whether the State elicited the testimony, (2) whether the trial court gave a curative instruction, and (3) the relative strength or weakness of the State's proof." State v. Welcome, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007).

-14-

In applying these factors to the present case, we first note that the State did not elicit the testimony from co-defendant Yewell. Although the Defendant argues that the statement was "clearly prompted" by the prosecutor because it was an implicit commentary on "where . . . [the Defendant] spen[t] most of his time[,]" we do not read the line of questioning as such. Co-defendant Yewell volunteered the general information that the Defendant had been previously incarcerated "most of the time" in response to the question of what percentage of time co-defendant Yewell encountered the Defendant at his grandmother's house.

Secondly, the trial court instructed the jury that the statement was "not responsive to the question"; that whether the Defendant was previously incarcerated "ha[d] nothing to do with this case"; that the court did not know whether the statement was factually accurate; and that the jury was not to consider the statement "for any purpose." We note that the trial court polled the jurors individually regarding the jurors' ability to disregard the statement and that the jurors each answered affirmatively. This court must presume that the jury abided by the trial court's instruction and ignored co-defendant Yewell's statement for the purposes of deliberations. Robinson, 146 S.W.3d at 494.

Lastly, the State's case against the Defendant was strong. Co-defendant Yewell and Mr. Wiggins both testified that the Defendant and co-defendant O'Neal planned a robbery of Hispanic people and that co-defendant O'Neal was armed. Co-defendant Yewell stated that he saw the Defendant with co-defendant Yewell's .38-caliber revolver, which co-defendant Yewell had lent to Mr. Champion and Mr. Champion had given to co-defendant O'Neal. Co-defendant Yewell acknowledged driving the Defendant and co-defendant O'Neal around town; identifying a target, the group of men on Gherald Street; and parking one street over while the Defendant and co-defendant O'Neal attempted the robbery. Co-defendant Yewell additionally testified that when the two men returned to the van, the Defendant stated that he thought he "hit" one of the victims in the chest. As stated above, there is sufficient evidence to support the jury's verdict.

We note that the Defendant's reliance on State v. Lloyd Rush Pratt, Jr., No. M2017-01317-CCA-R3-CD, 2018 WL 4005390 (Tenn. Crim. App. Aug. 20, 2018), is misplaced. In Pratt, a driving under the influence case, the defendant's inculpatory oral statement to a police officer was not disclosed in discovery. Id. at *3. In the statement, the defendant admitted to driving the car that had crashed. Id. at *1. During the police officer's testimony regarding the substance of the statement, defense counsel objected and informed the trial court of the discovery violation. Id. After a jury-out hearing, the trial court found that the statement was inadmissible, and counsel requested a mistrial, noting that the defense theory was that the Defendant was not driving the car and that counsel could not "unring that bell." Id. at *2, 5. The court declined to grant the motion and instead issued a curative instruction to the jury to disregard the statement because it

-15-

was not disclosed to the defense. Id. at *4. On appeal, this court concluded that the instruction was not sufficient to overcome the inherent prejudice in the defendant's admitting to having driven the car, noting that the State elicited the testimony and that the statement, which was highly prejudicial in the context of the other proof at trial, directly undermined the defense theory. Id. at *4-5. In contrast, the statement at issue in this case was not elicited by the State and did not in any way establish the Defendant's guilt of the charges at trial or impact the defense theory. The Defendant's argument is without merit.

Additionally, because the statement was unsolicited and a curative instruction was issued, the Defendant has not established the "manifest necessity" required for a mistrial. See State v. Smith, 893 S.W.2d 908, 923 (Tenn. 1995) (finding that the trial court properly denied a mistrial based on a witness's improper statement because the statement was unsolicited and followed by a curative instruction). We conclude that these considerations weigh against the Defendant's argument that a mistrial was necessary to avoid a miscarriage of justice. The trial court properly exercised its discretion by denying the Defendant's motion for mistrial, and he is not entitled to relief on this basis.

*III. Yewell Photographs*

The Defendant contends that the trial court erred by excluding photographs of co-defendant Yewell, arguing that this restriction on cross-examination undermined his presentation of the defense theory that co-defendant Yewell was protecting himself and "the true perpetrator" because of co-defendant Yewell's gang membership. The State responds that this issue has been waived.

The Defendant's brief contains no citations to legal authority regarding this issue. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Regardless, because the record documents the respective arguments of the parties, the trial court's reasoning, and the legal basis under which the objection was made at trial, we will consider the merits of his issue.

During a recess before co-defendant Yewell's testimony, the parties discussed the admissibility of photographs of co-defendant Yewell, in which he allegedly was "throwing gang signs." The photographs were exhibited to the jury-out hearing, but have not been included in the record on appeal. From the facts presented, we glean that in the first photograph, co-defendant Yewell, co-defendant O'Neal, and another man were making gestures with their hands. In the second, co-defendant Yewell was in court and "sticking his tongue out and flipping a bird." In three other photographs, co-defendant

Yewell was pictured alone or with other people making hand gestures or "flipping double birds." The last photograph depicted a large tattoo on co-defendant Yewell's back containing his name and the phrase "what doesn't kill me makes me stronger." The State argued that none of the photographs were relevant. Defense counsel argued that co-defendant Yewell's gang membership "would go towards motivation as to why" he was testifying "the way he [was]. To either protect or to get rid of the enemy or it goes toward his motive to testify[.]" After interjection by the State, defense counsel clarified that the photographs were relevant to co-defendant Yewell's bias or prejudice against the Defendant.

Upon questioning by the trial court, defense counsel stated that he did not know the identities of all the people in the photographs and that co-defendant O'Neal appeared in some of them. The court asked counsel whether an implication would arise that the Defendant was a gang member if it was established that co-defendants O'Neal and Yewell were gang members. Defense counsel responded negatively and noted that the Defendant did not appear in the photographs.

The State argued that gang membership was not "something that you can impeach somebody with without something more," that "[t]hrowing a gang sign" did not prove gang membership, and that proof of gang membership would be character evidence. The State noted that if the photographs were admitted, it would seek to admit proof of the Defendant's gang affiliation. Defense counsel responded that the proposed evidence was "not character evidence, it's bias. It's the reason it's biased and prejudice of why he's testifying."

Upon questioning by the trial court regarding whether co-defendant Yewell would claim the Defendant was also part of a gang, defense counsel responded, "I mean, I'm sure he's going to say whatever he needs to say[.]" The court noted that it believed counsel was "going down a very dangerous path here," that the information was not helpful to the Defendant, that "gangs commit crimes together usually," and that counsel was close to causing a mistrial.

The trial court stated that it believed the information was relevant because "it's going to make it more likely that [co-defendant] Yewell's in a gang, that they're all in a gang, frankly." Upon questioning by the prosecutor, the court stated that it thought the gang issue could be raised if defense counsel pursued it.

After extensive conversation regarding the relevancy of co-defendant Yewell's gang membership, defense counsel stated that the defense theory was that co-defendant Yewell and co-defendant O'Neal were in a different gang than the Defendant and wanted to "pin[]" the offenses on the Defendant as a third party to protect himself or another gang member. Defense counsel noted that co-defendant Yewell's tattoo was "talking

-17-

about killing"; the trial court found that the tattoo did not discuss killing and "ha[d] no relevance to gangs or anything."

During a subsequent jury-out offer of proof, co-defendant Yewell denied being a member or affiliate of a gang. He stated that in the photographs, he was raising his middle fingers; when asked about the manner in which other fingers were folded, co-defendant Yewell stated that it was "just how [his] hand [was]" and did not reflect intentional positioning. Co-defendant Yewell denied that anyone in the photographs held their fingers to make a letter "C" and stated that if it appeared as such, it was an "optical illusion." Co-defendant Yewell acknowledged that in one photograph, another man was mimicking holding a gun in one hand. Co-defendant Yewell stated that he knew what some gang signs looked like, that he had seen "a few," and that he had never "thrown" a gang sign. He denied that any of the people in the photographs were in a gang. Co-defendant Yewell acknowledged that in the photograph taken in court, his hands looked different than the other photographs; he noted that he was attempting to hide his rude gesture from the judge, bailiffs, or anyone else who could cause trouble for him. Co-defendant Yewell maintained that he was extending his middle fingers and not making other gestures in the photographs. The trial court agreed with the State that the photographs were not proof of gang membership. The court stated,

> Okay. I'm having a hard time seeing bias here. He said he's not in a gang. He's not testifying as a gang member against your client who is [a] non-gang member and not to say because he started to flip the bird and sticking his tongue out that he's showing bias against your client because he's taking this court system not seriously. I just think it's too much of a stretch. I'm going to deny it.

In the motion for a new trial, the Defendant raised the issue under Tennessee Rule of Evidence 616, which permits a party to "offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." The right to question a witness as to potential bias is a recognized fundamental right. Delaware v. Van Arsdall, 475 U.S. 673, 680 (1986); State v. Sayles, 49 S.W.3d 275, 279 (Tenn. 2001). "Although the trial court retains discretion regarding the exercise of the right to examine witnesses for bias, any undue restriction on that right may violate a defendant's right to confrontation under the Sixth Amendment of the United States Constitution and [a]rticle 1, [s]ection 9 of the Tennessee Constitution." State v. Rice, 184 S.W.3d 646, 670 (Tenn. 2006) (citations omitted). To prevail, the Defendant must establish that "he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, thereby exposing to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witnesses." Van Arsdall, 475 U.S. at

680; see also Rice, 184 S.W.3d at 670. The right of a defendant to impeach a witness for bias "includes the right to examine a witness regarding any promises of leniency, promises to help the witness, or any other favorable treatment offered to the witness." State v. Sayles, 49 S.W.3d 275, 279 (Tenn. 2001). A potential for bias exists when "a witness has a pending criminal charge in the same jurisdiction in which he or she is testifying at trial" due to the possibility that the prosecutor's office would "take favorable testimony into account when subsequently prosecuting the witness's pending charge." State v. Eric James Taylor, alias, No. E2002-00966-CCA-R3-CD, 2003 WL 21542464, at *5 (Tenn. Crim. App. July 9, 2003); see also State v. Echols, 382 S.W.3d 266, 285-87 (Tenn. 2010).

We note that original defense counsel, who was permitted to withdraw before trial, filed a motion to suppress unidentified photographs containing "depictions of individuals holding sums of money and making hand gestures" suggesting that "the Defendant, [c]o-defendant [O'Neal], and third parties [were] gang related or [involved with] gang activities." Original counsel also moved to suppress any testimony relative to the gang affiliation of the Defendant, the co-defendants, or any "third parties." Original counsel argued that "the prejudicial effect of introducing these photographs outweigh[ed] the probative value, as being possibl[y] involved in gang activity [was] not an element of this crime." The record does not contain any pretrial motion hearing transcripts and does not otherwise reflect the trial court's ruling on this motion. However, the prosecutor stated at trial that she would introduce evidence of the Defendant's gang affiliation if the gang-related line of questioning were pursued.

The trial court strongly cautioned the Defendant regarding the potential prejudice that would arise if the jury inferred that the Defendant was a member of the same gang as co-defendants O'Neal and Yewell. In fact, the court noted that defense counsel was close to causing a mistrial. Moreover, during the offer of proof, co-defendant Yewell denied being part of a gang, ever having made gang gestures, and that anyone in the photographs was part of a gang. No other evidence was presented that the Defendant, co-defendant Yewell, or co-defendant O'Neal were gang members, and the offenses themselves were not alleged to have been gang-related. The Defendant did not demonstrate that the jury could "appropriately draw inferences relating to" co-defendant Yewell's potential bias against the Defendant based upon the photographs. Van Arsdall, 475 U.S. at 680. Counsel cross-examined co-defendant Yewell extensively regarding the most potent evidence of potential bias, his plea agreement and testimony for the State in his various cases; counsel also brought out inconsistencies in co-defendant Yewell's testimony using his prior statements. Counsel was not prevented from otherwise proper cross-examination that would have allowed the jury to draw reasonable inferences of bias; in fact, the trial court's ruling prevented counsel from potentially causing such serious

-19-

prejudice to his client that a mistrial possibly would have followed. The Defendant is not entitled to relief on this basis.

## IV.  Closing Arguments

The Defendant contends that the trial court erred by "not allowing . . . counsel to review the credibility of certain of the State's witnesses during closing statements," arguing that counsel was improperly admonished for "commenting on the inconsistencies" in Mr. Wiggins's and co-defendant Yewell's testimonies. The Defendant asserts that the comments were "based on evidence" and that the court erred when it "sustained the prosecution's objections to refer to them."

During the Defendant's closing argument, counsel stated relative to Sergeant Kelly's not ordering the collection of DNA or fingerprint evidence, "Did you ask if anybody touched the cars? You're the lead investigator, ask questions. I don't get it." Counsel further commented regarding the investigation, "Here we have a double homicide. Here we're not doing our job. Why aren't we doing our job? I don't know. I can't believe it. This is a recipe for disaster[,] I'm telling you." Relative to the crime scene investigator's sketch not containing the locations of the cars on the street, counsel stated, "Are we asking to[o] much? I don't think so."

Counsel further commented relative to co-defendant Yewell's denying any knowledge of Alvaro's murder in his first police interview,

> When [co-defendant Yewell] comes in ten days later, oh, we got the whole story down now . . . . Are we suppose[d] to believe that? Are we suppose[d] to believe -- okay, maybe actually now that I'm thinking about [it,] Sergeant Kelly did kind of mess up a lot of stuff . . . . He's not doing a good job here. We're supposed to believe these guys. Wiggins and Yewell, no deal on that one. I don't believe him.

The State objected and during a bench conference stated:

> Judge, I try and give every deference to [counsel,] I really do. This is the third time he's made a personal reference to himself personally. I don't believe this. I don't think so. I doubt this. And I can't even count the number of times he specifically said this is a lie, which he's clearly not allowed to do. I mean at some point I can't let it go on.

> THE COURT: Okay. It's inappropriate.

> [COUNSEL]: Okay.

-20-

[THE STATE]:  Thank you, your Honor.

Counsel continued his argument and stated,

> Now the judge is going to give you the law, I'm just going to highlight
> some things.  Presumption of innocence.  Maintain[ed] the entire time
> unless it is rebutted and overturned by competent and credible proof.  I
> don't believe we have that.  Oh, oh, oh, sorry.  You've got to decide that.

Another bench conference followed, in which the State argued that counsel had "made a
big joke of" stating he could not give an opinion after being admonished by the court.
The court instructed the jury that "the attorney's personal opinions are not relevant to
these proceedings" and allowed counsel to finish his argument.

Trial courts have substantial discretionary authority in determining the propriety of
final argument, and although counsel is generally given wide latitude, trial judges must
restrict any improper commentary.  See Coker v. State, 911 S.W.2d 357, 368 (Tenn.
Crim. App. 1995).  Closing arguments must be temperate, must be based upon evidence
introduced during trial, and must be relevant to the issues at trial.  See State v. Sutton,
562 S.W.2d 820, 823 (Tenn. 1978).  Tennessee Supreme Court Rule 8 states that during a
trial, it is improper for a lawyer to "state a personal opinion as to . . . the credibility of a
witness[.]"  Tenn. R. Sup. Ct. 8, RPC 3.4(e)(3).

The Defendant mischaracterizes what transpired during closing arguments.  The
defense's closing statement comprises more than thirteen pages of transcript.  After
eleven and one-half pages of transcript, the prosecutor objected to counsel's repeated
references to himself and his opinion about the believability of the witnesses.  The trial
court agreed that the personal opinions were inappropriate, but did not take any further
action.

Counsel resumed his argument and immediately gave another personal opinion;
upon realizing his mistake, he stated that the jury "had to determine" whether the
evidence was credible.  The prosecutor objected to counsel's tone, stating that he made "a
big joke" of the correction, and the trial court issued an instruction that the attorneys'
opinions were not to be considered evidence and allowed counsel to finish his argument,
which he did some moments later.

The trial court did not err by giving an instruction that was a correct statement of
the law.  Contrary to the Defendant's argument on appeal, counsel was not prohibited
from discussing any piece of evidence or inconsistencies in the evidence; counsel was
admonished that he should not characterize the evidence as credible or incredible in
counsel's personal opinion.  We note that counsel's closing argument was extensive and

reviewed in detail inconsistencies in the witness testimony, motivations Mr. Wiggins and co-defendant Yewell had to lie, and perceived issues with the police investigation, including the lack of testing for DNA and fingerprint evidence. The Defendant is not entitled to relief on this basis.

## V. Judgment Forms

Although the sentencing hearing transcript was not included in the record on appeal, it is apparent that clerical errors and internal inconsistencies exist in the judgment forms. Upon examination of the record, the judgment form in Counts 1 and 2, first degree felony murder, do not have the box for a guilty verdict marked. Count 2 additionally does not have the TDOC sentence box marked, and it does not reflect whether Count 2 is to be served concurrently or consecutively to Count 1. Count 5, employing a firearm during the commission of a dangerous felony, reflects that the sentence is to be served concurrently with Shelby County case number 15-05135, whereas each of the fifteen other judgment forms reflect consecutive service with case number 15-05135. Count 15, attempted aggravated robbery, does not have the class of felony for the conviction offense circled.

Moreover, Counts 3, 4, 6-11, and 13-15 reflect consecutive service with Shelby County case number 15-109300, but this case is not referenced in the remaining judgment forms. It is unclear whether this was intentional. We remand for the entry of corrected judgment forms in Counts 1, 2, 5, and 15, and for verification by the trial court that the remaining judgment forms accurately and completely reflect its sentencing order.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed. The case is remanded for the entry of corrected judgments consistent with this opinion.

_____
D. KELLY THOMAS, JR., JUDGE

-22-